RAWLS, Acting Chief Judge.
The primary issue in this appeal is whether appellant Romano (buyer) is entitled to specific performance pursuant to a real estate contract entered into with ap-pellee Pandapas (seller).
The buyer contends that the trial court erred by entering summary judgment for the seller; that it should have entered summary judgment in his behalf, or at least found that a material issue of fact is present.
In December of 1972, Romano, who lived in Illinois, contacted a real estate agent in Daytona Beach about purchasing a parcel of land that adjoined land he owned in Volusia County, Florida. The realtor advised Romano that the subject property had been on the market two months ago at thirty-two hundred and fifty dollars per acre.[1] The realtor then contacted Panda-pas, who was vacationing with his wife and children at Sun Valley, Idaho, by telephone and advised that he had a potential buyer for the property. Pandapas asked the realtor what he thought it was worth, and the reply was “thirty-two fifty” an acre. Pandapas then told the realtor to “get a contract, see how it looked.” The realtor prepared an option contract and sent it to Romano. Upon examining the option contract forwarded by the realtor, Romano discovered that it included not only the property of Pandapas but also property owned by Romano. The contract ff was redrafted by Romano, who executed same, and forwarded it to the realtor. The realtor then called Pandapas, who was still in Idaho, Pandapas telephoned his attorney, Paul E. Raymond, in Daytona Beach, asked him to examine the contract, and asked Raymond to sign it as “his attorney or agent”. Raymond examined the contract, made some changes by adding to it certain restrictions and exceptions contained in the title, signed it “George Pan-dapas by Paul Raymond his attorney and agent”, and returned it to the realtor.
On New Year’s Eve or New Year’s Day (1973), Pandapas, who was still vacationing at Sun Valley with his family, told his wife that he had agreed to sell the subject property, and she at this time did not approve or disapprove. Pandapas returned to Daytona Beach on January 5, 1973. Pandapas testified that on January 8, 1973, he received a telephone call from a Mr. Townsend, a realtor, and that the following conversation transpired:
"... since Mr. White is going to buy Mr. Romano’s property, they may be interested in mine and I sighed and said, ‘It’s tough, you will have to speak to Mr. Romano. That property is under contract.’ And I asked him at that time what Mr. Romano is selling his property for and he said something in the vicinity of nine thousand dollars an acre.”
*98 In continuing his testimony, Pandapas stated:
“That night, when I talked to my wife, I told her that I had had a kick in the teeth that day. I found the property which I had contracted to sell for thirty-two hundred an acre might be worth considerably more and I told her what Jimmy Townsend told me whereupon she hit the roof, said she would not go along with it, and threatened to call her lawyer and find out what her position is.
“Whereupon, I asked for a copy of the option contract to find out how somehow I could get out of it because it put me in a very embarrassing situation.
“After considerable thinking, I asked Mr. Raymond if there is someway we could notify Mr. Romano that I can’t go through with the transaction.
“That is when the telegram went out to Mr. Romano.” [2]
The option contract provided February 21, 1973, as the closing date. Romano and his attorney met with Raymond (Pandapas’ attorney) on that date in Daytona Beach and discussed closing the transaction. Raymond advised Romano that Mrs. Pan-dapas would not join in the conveyance, but that Mr. Pandapas would convey whatever interest he had. Romano took the position that he was entitled to a conveyance from Pandapas with abatement in the purchase price for Mrs. Pandapas’ inchoate dower rights. Negotiations between the parties continued for several weeks thereafter, but no accord was reached since Romano insisted that he was legally entitled to abatement and Pandapas refused to convey for any sum less than the contract terms. In May of 1973, Romano instituted the instant suit seeking specific performance. Shortly thereafter, a legislative enactment repealed the statutory provision which provided for inchoate dower effective October 1, 1973. Romano then advised Pandapas that he would accept his conveyance without abatement, which offer was refused on the grounds that the time for performance of the contract had expired. Romano subsequently amended his complaint removing his objection to Pan-dapas’ conveyance without the wife’s join-der. Summary judgment was later entered by the trial court in favor of Pandapas.
In Knox v. Spratt, 23 Fla. 64, 6 So. 924 (1887), the Supreme Court stated:
“The doctrine that, in case the vendor is unable to comply with the contract by reason of not having legal title to all the land sold, yet that the vendee is entitled to a specific performance of the contract for such as is in the power of the vendor to convey, with compensation for the residue, is undoubted.” (emphasis supplied)
This doctrine is reiterated in Fisher v. Miller, 92 Fla. 48, 109 So. 257 (1926), wherein the wife’s inchoate dower interest was the primary question. The Supreme Court, in quoting extensively from Pome-roy’s Specific Performance, adopted the view that specific performance with abatement was available to a vendee without notice that the vendor is married. In so holding, the court unequivocally stated: “The marriage status should not be used as a shield to prevent the enforcement of the just obligation of a man who presents no other excuse to justify his nonperformance.” (emphasis supplied) Paradise Pools v. Genauer, 104 So.2d 860 (Fla.App.3d 1958), is squarely in point. There, the appellate court, citing Fisher, supra, held that the vendee was entitled to specific performance of an option contract with the vendor with an abatement of the purchase price in the absence of a release of the wife’s dower, if the vendee was not *99 charged with notice or knowledge of the marital status of the vendor.
Romano’s complaint alleged that he had no knowledge that Pandapas was married at the time the option agreement was entered into. Pandapas answered that he was without knowledge as to this allegation and affirmatively alleged that Romano had a duty to inquire as to his marital status. Depositions of the parties, attorney Raymond, and an affidavit of the realtor wholly fail to prove any knowledge on the part of Romano as to Pandapas being married. The initial agreement was prepared by the realtor, forwarded to Romano at his office in Chicago, and examined by Raymond. Although Raymond was fully aware that his client Pandapas was married, the initial contract was in the sole name of Pandapas, as seller. Romano revised the contract, primarily as to description, and forwarded same back to the realtor together with the agreed upon earnest money. Prior to executing the contract, Raymond added certain title exceptions which were subsequently initialed by Romano. The final contract did not mention Pandapas’ marital status. Pandapas testified in his deposition: “I asked Mr. Raymond to execute the agreement in my behalf, feeling confident when the time came to close a deal, I would persuade my wife to provide the necessary signature.” He further testified that prior to this instance, his wife had never refused to sign a deed or contract and that the reason for her refusal to sign the instant contract was “simply that she didn’t want me to sell the land at that price.”
A review of this record leads one to the inescapable conclusion that Pandapas’ refusal to convey to Romano was founded solely upon his belief that the sales price was far below what he might have been able to obtain. This conclusion is buttressed by the actions of Pandapas in asking Raymond to find some way that he could refuse to go through with the transaction, which resulted in the telegram sent to Romano. The hard fact that screams from this record is that Pandapas has used his marital status as a shield to prevent the enforcement of his just obligation.
Pandapas argues that the matter of abatement has utterly no relevance to the present facts since Romano amended his complaint and dropped the demand of abatement. This argument fails for three reasons: 1) At the time suit was instituted, Romano, as a matter of law, was entitled to specific performance from Panda-pas with abatement; 2) the well established rule as stated in Goodfriend v. Druck, 289 So.2d 710 (Fla.1974),[3] was applicable; and 3) the amended complaint continued to claim abatement “if Defendant dies during the pendency of this litigation, Plaintiff demands an abatement in the purchase price equal to the incohate dower of Defendant’s surviving spouse.” Also urged by Pandapas is the following provision of the option contract pertaining to title to the property if found uninsurable: “Seller agrees to use diligence to make it insurable and shall have 45 days in which to do so, or at the written request of purchaser, seller shall deliver title in its existing condition.” Pandapas contends that this provision relieved him of having to convey his interest with abatement.
As stated above, this record is replete with evidence that Pandapas not only failed to use diligence to make the title insurable, but to the contrary, he exerted every effort available to him to escape his just obligation. Pandapas knew he was married at the time he entered into the contract; Pandapas knew that his wife would be required to join in the conveyance, and he thought that she would so *100 join. Equity and good conscience entitled Romano to specific performance of the subject property.
REVERSED with directions to enter judgment in favor of appellant Romano for specific performance.
MILLS and SMITH, JJ., concur.

. Pandapas had listed the property prior to December, 1972, with other brokers for approximately three thousand dollars per acre.

. The following telegram prepared by Raymond over the signature of his client, Pan-dapas, was sent to Romano on January lb, viz: “Re proported [sic] agreement dated December 21, 1&72 I conclude that it is void and without effect due to lack of mutuality and consideration and also for other reasons. George I. Pandapas.”

. The Supreme Court stated: “ . . . an appellate court, in reviewing a judgment on direct appeal, will dispose of the case according to the law prevailing at the time of the appellate disposition.”